FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RON HARPER, KEVIN PERKINS, WILLIAM ELLIOT and ROBERT McCOY, ) ) ) ) | |
| Plaintiffs, ) | |
| ) | No. 87 C 5112 |
| v. ) | |
| CITY OF CHICAGO HEIGHTS and the ) CHICAGO HEIGHTS ELECTION ) COMMISSION, ) ) ) | HONORABLE DAVID H. COAR |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

For nineteen years, the parties have been involved in ligation to insure that the election

process for the Chicago Heights City Council complies with Section 2 of the Voting Rights Act

of 1965, as amended, 42 U.S.C. § 1971 et seq. A Section 2 violation has long since been

established; this case is presently in its remedial phase. On October 2, 2002, this Court

appointed Richard Engstrom, a Research Professor of Political Science at the University of New

Orleans, as Special Master in this case to assist in crafting a remedy. Presently before the Court

are the recommendations of Richard Engstrom as to which party's proposed remedy to adopt.

The Court has reviewed the recommendations as well as the objections raised by the parties to

these recommendations. For the reasons set forth below, the Court orders that the Perkins and

McCoy plan and map (the "Individual Plaintiffs' plan and map") be adopted for the City of

Chicago Heights City Council elections.

-1-

## I. BACKGROUND[1]

In 1987 and 1988, Ron Harper, Kevin Perkins, William Elliot, and Robert McCoy[2] filed complaints for injunctive and other relief against the City of Chicago Heights ("City"), the Chicago Heights Election Commission, the Chicago Heights Park District ("Park District"), and Stanley Kusper, Clerk of Cook County. The complaints alleged that the non-partisan, at-large elections for City Council and the Park District Board violated Section 2 of the Voting Rights Act by diluting the opportunity of African Americans to elect representatives of their choice.[3]

Pursuant to a consent decree approved by Judge Will on May 24, 1994, the City and the Park District abandoned the at-large election method and created a new system of government. "The new plan was designed around six single member districts for the election of six City Council members and six single member districts for the election of six City Council members and six Park Board Commissioners, with a mayor and Park Board president elected at-large."

---

[1] This case has a lengthy procedural and factual history that is only summarized here, and only with regard to the City of Chicago Heights City Council. The history of the case against the Park District (which has been resolved, see Harper v. City of Chicago Heights, 223 F.3d 593 (7th Cir. 2000)) and the disputes over attorney fees have been omitted. Earlier opinions recite the history of this litigation extensively. See Harper v. City of Chicago Heights, 824 F. Supp. 786 (N.D. Ill. 1993); Perkins v. City of Chicago Heights, 47 F.3d 212 (7th Cir. 1995); Harper v. City of Chicago Heights, No. 87-C-5112, 88-C-9800, 1997 WL 102543 (N.D. Ill. March 5, 1997); McCoy v. Chicago Heights, 6 F. Supp. 2d 973 (N.D. Ill. 1998); and Harper v. City of Chicago Heights, 223 F.3d 593 (7th Cir. 2000).

[2] The plaintiffs in this case are divided into the "Class Plaintiffs" (Ron Harper and William Elliot) and the "Individual Plaintiffs" (Kevin Perkins and Robert McCoy).

[3] As explained in Thornburg v. Gingles, 478 U.S. 30, 43 (1986), the relevant part of Section 2–subsection 2(b)–"establishes that § 2 has been violated where the 'totality of the circumstances' reveal that 'the political processes leading to nomination or election . . . are not equally open to participation by members of a [protected class] . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."

Harper v. City of Chicago Heights, No. 87 C 5112, 88 C 9800, 1995 WL 706898, *1 (N.D. Ill. Nov. 30, 1995). The form of government prescribed in the consent decree was a deviation from the forms of government provided for in the Illinois Municipal Code. See generally Harper v. City of Chicago Heights, 223 F.3d 593, 597 (7th Cir. 2000).

Two of the named plaintiffs, Kevin Perkins and Robert McCoy (hereinafter the "Individual Plaintiffs"), appealed the entry of the consent decree to the Seventh Circuit Court of Appeals, which vacated the decree and remanded the case on February 7, 1995. See Perkins v. City of Chicago Heights, 47 F.3d 212, 218 (7th Cir. 1995). The Seventh Circuit found that the parties did not have the ability to consent to modifications in statutorily prescribed forms of government absent a finding that "such a remedy is *necessary* to rectify a *violation of federal law*." Id. at 216 (emphasis in original). The Court ruled that, without such a finding, the parties could only "agree to that which they have the power to do outside litigation." Id. Thus, on November 7, 1995, the form of city government contained in the consent decree was approved by Chicago Heights voters in a referendum.

By order of December 21, 1995, the Chicago Heights litigation was reassigned to this Court. Ron Harper and William Elliot (hereinafter the "Class Plaintiffs") then filed motions to dismiss on grounds of mootness. In August of 1996, this Court held a hearing on the mootness issue and on the issue of whether the City and the Park District's previous form of governance violated Section 2 of the Voting Rights Act (since the consent decree had been approved prior to a finding of a violation). The Court found that the old at-large election system did violate Section 2, but there was insufficient evidence to determine whether the new form of governance adopted by referendum was an appropriate remedy. See Harper v. City of Chicago Heights, et al., 87-C-

5112, 88-C-9800 1997 WL 102543, at *5, *14 (N.D. Ill. March 5, 1997). Accordingly, this Court ordered the parties to propose new governmental structures and voting maps designed to remedy the Section 2 violation. Id. at *14.

After evaluating the proposals submitted by the parties, this Court rejected the proposals of the City, the Park District, and the Class Plaintiffs, and accepted in part the proposal of the Individual Plaintiffs. The Court modified that proposal by implementing a system under which seven aldermen were elected at-large by cumulative voting. See McCoy, et al. v. Chicago Heights, et al., 6 F. Supp. 2d 973, 982 (N.D. Ill. 1998).

The City, the Park District, and the Class Plaintiffs appealed. In a decision issued on July 27, 2000, the Seventh Circuit affirmed this Court's holding that the election method adopted by referendum, as it applied to the City, violated Section 2 of the Voting Rights Act. See Harper, 223 F.3d at 605. The Seventh Circuit reversed, however, this Court's remedy for the violation and remanded the case to this Court to craft a suitable remedy. Id. The Seventh Circuit held that this Court had "modifie[d] the election methods set forth in the Illinois Municipal Code without either going through the statutorily required procedures for making such changes to electoral methods or making a judicial finding that it was necessary to make these changes in order to comply with federal law." Id. at 601. Additionally, the Seventh Circuit took note of the City's preference for single member districts and held that "[w]e should defer to the City's plan to the extent possible as long as it does not violate federal law." Id. at 602.

Subsequent to the Seventh Circuit's remand and pursuant to Rule 53 of the Federal Rules of Civil Procedure, this Court appointed Richard Engstrom as Special Master in this case

(hereinafter, Richard Engstrom is referred to as the "Special Master"). The October 2, 2002

appointment order charged the Special Master with:

> the duty to prepare and file with the Court a report, including a proposed redistricting
> plan, for adoption by this Court, for the City of Chicago Heights, dividing the City into
> single member districts, unless to do so would violate federal law.

In developing a plan for the City, the Special Master was directed to adhere to and, where

possible, reconcile the following guidelines:

> (a) Districts shall be of substantially equal population, compact and contiguous,[4]
> (b) The plan shall comply with 42 U.S.C. §1973(b) and with other applicable provisions
> of the Voting Rights Act.[5]

Further, the Court directed the Special Master to consider the materials already submitted to the

Court by the parties, and allowed him to invite any additional submissions, if desired, from the

parties. The Order permitted the Special Master to adopt one of the parties' proposed redistricting

plans so long as that plan did not violate state or federal law.

On October 27, 2004, the Special Master submitted his report to this Court. The report,

which the next section discusses in detail, compares the maps presented by the parties at a public

meeting in Chicago Heights on October 1, 2003. At that meeting, the City presented a map with

seven single-member districts, a strong city council composed of a member from each of the

---

[4] See 65 Ill. Comp. Stat. 5/3.1-20-25(a) (2006) ("In the formation of wards, the number of inhabitants of the city immediately preceding the division of the city into wards shall be as nearly equal in population, and the wards shall be of as compact and contiguous territory, as practicable.").

[5] 42 U.S.C. §1973(b) (2006) provides that a violation occurs when "the political processes leading to nomination or election in the . . . political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."

seven districts, and a weak mayor elected at-large. The Individual Plaintiffs proposed an aldermanic form of government with a weak-mayor framework and two representatives elected from each of seven wards. These wards differ from the wards drawn by the City. The Class Plaintiffs also proposed seven wards which were drawn differently than the wards drawn by both the Individuals Plaintiffs and the City. In advance of his report, the Special Master attended this hearing, met with the parties, and toured Chicago Heights.

The Court docketed the Special Master's report and directed the parties to file any objections to the report. The Class Plaintiffs had no objections to the recommendations of the Special Master but urged this Court to reject any proposed plan that deviates from the law of Illinois. The Individual Plaintiffs and the City had several objections to the Special Master's Report which this Court will discuss.

Finally, on March 4, 2005, the Class Plaintiffs filed a stipulation to accept the map proposed by the Individual Plaintiffs. On March 30, 2005, over the objections of the City, the Court granted the Class Plaintiffs' stipulation. Consequently, if this Court credits the Special Master's findings that the Class Plaintiffs' and Individual Plaintiffs' plans comply with the Voting Rights Act but the City's plan does not, the Court will adopt the Individual Plaintiffs' plan and map.

## II. STANDARD

"Once a right and a violation has been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." U.S. v. Paradise, 480 U.S. 149, 183-84 (1987) (quoting Swann v.

-6-

Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 15 (1971)). When a Section 2 violation, specifically, has been found, a district court:

> must, wherever practicable, afford the jurisdiction an opportunity to remedy the violation first, . . . with deference afforded the jurisdiction's plan if it provides a full, legally acceptable remedy. But if the jurisdiction fails to remedy completely the violation or if a proposed remedial plan itself constitutes a § 2 violation, the court must itself take measures to remedy the violation.

Harper, 223 F.3d at 599-600 (quoting Dickinson v. Indiana State Election Board, 933 F.2d 497, 501 n.5 (7th Cir. 1991)). If the district court must fashion a reapportionment plan or choose among plans, it should not "intrude upon state policy any more than necessary." White v. Weiser, 412 U.S. 783, 795 (1973) (quoting Whitcomb v. Chavis, 403 U.S. 124, 160 (1971)). A district court should only follow the policies and preferences of the state, however, if those policies and preferences do not "detract from the requirements of the Federal Constitution." Id.[6]

## III.   DISCUSSION

### A.   Substantially Equal Population, Compactness, and Contiguity

One of the two guidelines given the Special Master was to recommend a plan with single-member districts that are of substantially equal population, compact, and contiguous. Since, as will be explained below, the Special Master determined that the districts in all three plans are contiguous and compact and comply with Section 2 of the Voting Rights Act (the second

---

[6] The law on state legislative and congressional reapportionment applies to municipal reapportionment as well. See, e.g., Wise v. Lipscomb, 434 U.S. 1329, 1331 (1977) (holding that "municipal election plans are entitled to the same respect accorded those of state legislatures").

guideline), the only significant difference the Special Master found between the plans was whether they contained districts of substantially equal population.

### 1.    Substantially Equal Population

As the Special Master correctly noted in his report, the "substantially equal population" criterion requires that districts satisfy the Supreme Court's "one person, one vote" rule for local governments. See Board of Estimate v. Morris, 489 U.S. 689, 692-93 (1989). See generally Hadley v. Junior College District of Metropolitan Kansas City, Missouri, 397 U.S. 50, 56 (1970) (holding that the "one person, one vote" principle requires that "each qualified voter must be given an equal opportunity to participate in th[e] election, and when members of an elected body are chosen from separate districts, each district must be established on a basis that will ensure, as far as is practicable, that equal numbers of voters can vote for proportionally equal numbers of officials."). The Supreme Court has provided a benchmark for determining whether a plan violates the "one person, one vote" principle. As explained by the Special Master:

> The average population size of a district is determined by dividing the population of the city by the number of districts. The population of each district is then subtracted from the average, and the difference is expressed as a percentage of the average. Those above the average deviation are expressed as positive percentage deviations, those below the average as negative percentage deviations. The deviations for the two districts with the greatest deviation above the average and below the average are combined, ignoring their signs, into a total deviation figure. If this figure is less than 10 percentage points, the plan is "presumptively constitutional" and those challenging the plan are required to demonstrate why, despite these small deviations, the plan does not comply with the one person, one vote rule. If the figure is 10 percentage points or higher, however, those defending the plan must explain why that rule has been satisfied.

-8-

See Brown v. Thomson, 462 U.S. 835, 842-43 (1983). See generally Frank v. Forest County, 194 F. Supp. 2d 867, 873-74 (E.D. Wis. 2002).

The Special Master then provided the relevant statistics for Chicago Heights. According to the U.S. Census Bureau, the total population of Chicago Heights is 32,776. The average district in a seven-district plan, when rounded off to the nearest whole number, is 4,682. The plans presented by the Individual Plaintiffs and Class Plaintiffs contain districts in which the combined deviations, based on total populations figures, are 6.1 and 1.0 respectively. This falls below the 10% threshold. The plan presented by the City has a combined deviation of 11.9, which exceeds the 10% threshold. As the Special Master noted in his report, a plan that exceeds the 10% threshold is not *per se* unconstitutional; it merely creates a prima facie case of discrimination. See Brown, 462 U.S. at 843. The party defending a plan that exceeds the 10% threshold can argue that the deviations were the result of applying "rational state policies" that justify the deviations. See id. (quoting Mahan v. Howell, 410 U.S. 315, 325 (1973)).

The Special Master noted, however, that the City has not cited any such policies. Instead, the City argues that voting age population, rather than total population, should be used in calculating whether a plan satisfies the "one person, one vote" principle. When voting population rather than total population is used, the City argues, the differences between the combined deviations of the three plans are negligible. The Special Master determined that whether voting age population or total population should be used is a legal issue reserved for this Court.[7]

---

[7] To prepare for both outcomes, the Special Master calculated population equity using total population *and* using voting age population. The Special Master noted that the City's plan still does not fit within the 10% deviation when voting age population, rather than total population, is used. In fact, the Special Master found that use of voting age population only magnifies the inequality of the districts proposed by the City. This finding, of course, is irrelevant

The Court finds that total population should be used to determine whether districts satisfy the "one person, one vote" principle. The "one person, one vote" rule from Supreme Court equal protection case law is different from the minority vote dilution issue addressed by the Voting Rights Act. This Court has asked the Special Master to recommend a plan that complies with both equal protection case law (i.e., by requiring districts of substantially equal population that are also compact and contiguous) *and* Section 2 of the Voting Rights Act. In this Circuit, citizen voting age population is the proper measure for latter (the Voting Rights Act inquiry). That is the holding in Barnett v. City Chicago, 141 F.3d 699 (7th Cir. 1998). Barnett held that voting age population, or citizen voting age population, is the proper measure *to determine proportional equality of voting power under the Voting Rights Act.* See id. at 705. As explained above, this is a question of vote dilution and a statute. Barnett does not say that voting age or citizen voting age population is the proper measure to determine whether a plan satisfies *the "one person, one vote" rule.* This is an equal protection question flowing directly from the Constitution. [8]

The case law reflects this distinction. The reapportionment cases discussing the "one person, one vote" principle all condone the use of total population as a measure. See, e.g., Reynolds v. Sims, 377 U.S. 533 (1964) (using total state population); Brown v. Thompson, 462 U.S. 835 (1983) (using total county population); Board of Estimate v. Morris, 489 U.S. 689 (19889) (using total city population). Indeed, as the Special Master notes, most jurisdictions use

given this Court's holding, below, that total population is the proper measure for determining whether a plan satisfies the "one person, one vote" principle.

[8] This finding represents a reversal of the Court's position in its Order dated September 6, 2005, which requested the parties to consider whether new plans and maps needed to be submitted to the Special Master "in light of the fact that voting age population is the proper of measure of population equity." That order misstated the holding in Barnett.

-10-

total population. Moreover, as the Class Plaintiffs argue, Illinois law speaks of simply

"population." See 65 Ill. Comp. Stat. 5/3.1-20-25(a) (2006) ("In the formation of wards, the

number of inhabitants of the city immediately preceding the division of the city into wards shall

be as nearly equal in population . . ."). The Seventh Circuit has twice held that state law should

not be ignored in this case. See Harper, 223 F.3d at 601; Perkins, 47 F.3d at 217.

By contrast, the cases concerning the dilution of minority voting strength in violation of

Section 2 use voting age population or citizen voting age population as the measure. See, e.g.,

Barnett, 141 F.3d. 7004-06 (requiring the use of citizen voting age population); Ketchum v. M.

Byrne, 740 F.3d 1398, 1412 (7th. Cir. 1984) (affirming the use of voting age population). The

court in Frank v. Forest County, 194 F. Supp. 2d 867 (E.D. Wis. 2002), followed precisely the

methodology used by the Special Master in the instant case: In computing the size of the districts,

the court used total population figures. Id. at 873. In measuring proportionality to determine

whether the districting plan diluted minority votes in violation of Section 2, the court, following

Barnett, used citizen voting age population. Id. at 877.

Finally, nothing in the Voting Rights Act dictates that parties must use voting age

population instead of total population for the "one person, one vote" inquiry. Thus, the Court

finds that the Special Master's use of total population to calculate percentage deviations in the

parties' plans was correct.

After performing the test set out in Brown, the Special Master concluded that, because the

Individual Plaintiffs' and Class Plaintiffs' plans had deviations below the 10% threshold, they

should be considered presumptively constitutional. The City's plan, with deviations above the

10% threshold *and no justifications for those large deviations*, should be considered

-11-

presumptively unconstitutional. As a consequence, the Special Master declined to recommend the City's plan to this Court. Morever, the Special Master determined that "the Class Plaintiffs' plan is considerably closer to perfect equality than that of the Individual Plaintiffs." Special Master's Report at 18. Since "the Class Plaintiffs have come closer to achieving the goal of equi-populous districts," the Special Master recommended the Class Plaintiffs' plan to this Court. Id.

## 2. Compactness

The Special Master reported that there is no bright-line test to determine whether a district is compact; districts may only be considered more or less compact. He therefore employed the two most common measures of compactness, a dispersion measure known as the Roeck measure and a perimeter measure known as the Polsby-Popper measure. To determine the compactness of the districts in the parties' proposed plans, he compared their scores along the Roeck and Polsby-Popper measures to the compactness of the current six-district plan in Chicago Heights. The Special Master noted that, when comparing plans, one must focus on the least compact districts, rather than the most compact districts or the average compactness of districts. After providing the scores for all of the proposed districts and identifying the least compact district in each plan, the Special Master determined that none of the plans contain districts with bizarre shapes and none contain districts that depart substantially in compactness scores from the districts in the current six-district plan. All three plans, the Special Master concluded, "satisfy that compactness standard, as that standard has been applied in Chicago Heights in the only city council districting plan that has been used since the elimination of the at-large election system." Special Master's Report at 10.

### 3. Contiguity

The Special Master reported that contiguity is a much simpler concept: A district is contiguous if a person can go from any point within the district to any other point within the district without leaving the district. The Special Master concluded that all of the districts in each of the proposed plans satisfy the contiguity principle. None of the plans even contain bodies of water connecting otherwise separate parts of a district, or connect districts at only one point.

### B. Compliance with the Voting Rights Act

The second guideline the Special Master was compelled to follow was to recommend a plan that complied with 42 U.S.C. §1973(b) and other applicable provisions of the Voting Rights Act. To that end, the Special Master examined (a) the minority percentages of the voting age populations in the plans' districts and (b) whether, in creating the districts, the parties subordinated traditional districting principles to racial considerations, thus triggering strict scrutiny of the plan under the Fourteenth Amendment.[9]

---

[9] The Special Master also examined whether there were minority vote dilution implications resulting from whether districts elect one or two representatives. He found "no measurable, systematic differences in the ability of minority voters in Chicago Heights to elect representative of their choice between the single and two-member contexts." Special Master's Report at 17. The Court will ignore this finding, however, since, pursuant to the Seventh Circuit's decision in Harper, 223 F.3d at 602, this Court ordered the Special Master to recommend only plans that divide the City into single member districts.

## 1. Minority Percentages of Voting Age Population

As the Special Master correctly noted, Section 2 of the Voting Rights Act prohibits the use of an electoral system that dilutes a protected minority's voting strength. See Thornburg v. Gingles, 478 U.S. 30, 88 (1986) (O'Connor, J., concurring) (stating that "the essence of a vote dilution claim is that the State has created single-member or multimember districts that unacceptably impair the minority group's ability to elect the candidates its members prefer"). African Americans and Hispanics are the two groups that garner concern about vote dilution in Chicago Heights. The voting age population of the city, as recorded in the 2000 census, is 33.9% African American (33.6% non-Hispanic African American) and 21.5% Hispanic. The current six-district plan contains two majority-African American districts and one majority-Hispanic district. Each of the seven-district plans proposed by the parties contains two majority-African American districts, one majority-Hispanic district, and an additional majority-minority district if these two groups are combined.

The Special Master concluded that there are no serious differences in the minority composition of the districts in the three proposed plans. Indeed, the parties agreed as much at a November 11, 2002 meeting that the Special Master attended.

The Special Master also determined that the districts in all three plans would survive a vote dilution challenge under Section 2. As the Special Master correctly noted, the Supreme Court held in Gingles that a minority group claiming vote dilution through the use of multimember districts must prove three threshold conditions. First, the minority group must show that they are "sufficiently large and geographically compact to constitute a majority in a single-member district." 478 U.S. at 50. Second, they must prove that the group is "politically

-14-

cohesive." Id. at 51. Third, they must prove that the white majority votes as a bloc to defeat the

minority group's preferred candidate. Id. These conditions also apply to Section 2 challenges to

single-member districts. Growe v. Emison, 507 U.S. 25, 40-41 (1993); Voinovich v. Quilter, 507

U.S. 146, 157-58 (1993). The Special Master concluded all three proposed plans would be

upheld under Section 2 because the first of the three necessary conditions cannot be shown: No

additional district, beyond those in the current plans, can be created in which members of a

protected group in Chicago Heights constitute a majority.


### 2. Racial Gerrymandering

The Special Master also examined whether any of districts in the proposed plans would be

subject to strict scrutiny because of an allegation that the district constitutes a racial gerrymander.

Shaw v. Reno, 509 U.S. 630, 649 (1993) indirectly defines racial gerrymandering as

reappointment that, although facially race-neutral, "rationally cannot be understood as anything

other than an effort to separate voters into different districts on the basis of race" without

sufficient justification. To prove the existence of a racial gerrymander, "a plaintiff must prove

that the legislature subordinated traditional race-neutral districting principles, including but not

limited to compactness, contiguity, and respect for political subdivisions or communities defined

by actual shared interests, to racial considerations." Miller v. Johnson, 515 U.S. 900, 916 (1995).

 Because these race-neutral principles have not been disregarded in the parties' proposed

plans, the Special Master concluded that the plans would easily defeat a claim that districts were

gerrymandered on racial lines. See id. As discussed earlier, the Special Master determined that

all three plans have contiguous districts and satisfy the compactness principle. Further, the plans

-15-

do not upset the boundaries of political subdivisions because there are no political subdivisions in Chicago Heights. Finally, although there is no widely agreed upon definition of the concept "communities of interest," see Hastert v. State Board of Elections, 777 F. Supp. 634, 660 (N.D. Ill. 1991), the Special Master observed that there were no allegations at the October 1, 2003 public hearing that any of the plans violated a "community of interest." Neither were there allegations that the plans violated any other traditional districting principle.

Thus, the Special Master concluded that no plan contains districts that would constitute a racial gerrymander, and no plan dilutes minority voting strength in violation of Section 2.

## C.     The Parties' Objections

The Individual Plaintiffs and the City raised objections to the Special Master's Report. The Court will only discuss their material objections.

First, the Individual Plaintiffs insist that state law requires each ward in Chicago Heights to elect two aldermen, not one. As noted earlier, however, the Seventh Circuit ruled that this Court and the parties should defer to the City's preference for single member districts. Harper, 223 F.3d at 602. The order directing the Special Master to recommend a plan with single member districts reflects this ruling.

Second, the Individual Plaintiffs complain that the Class Plaintiffs' map unnecessarily splits too many precinct voting districts[10] and fails to use political subdivisions as precinct lines. Therefore, they argue, the Special Master's favorable analysis of the Class Plaintiffs' plan is

---

[10] The Individual Plaintiffs maintain that the Class Plaintiffs split sixteen of thirty-four precincts, whereas they split only two.

-16-

flawed; both the Class Plaintiffs and the City could have produced a map with fewer percentage deviations. Consequently, the Individual Plaintiffs argue, both the Class Plaintiffs' and the City's map will have a negative impact on the ability of African Americans to elect representatives of their choice. The Individual Plaintiffs add that, in their view, the Class Plaintiffs' map fails to meet the contiguity requirement.

Third, the Individual Plaintiffs protest the practice of comparing the plans' scores along the two compactness measures to the compactness of the current six-district plan in Chicago Heights. The Individual Plaintiffs regard the current six-district plan as questionable, if not illegal, and they argue that a visual (simply looking at the maps to determine compactness) is not necessarily a less objective method of determining compactness than the method employed by the Special Master. As an example, the Individual Plaintiffs point to the West-North and Prairie State districts in the City's map; they claim that a visual allows one to see that the map splits the African American community in these districts. Thus, the map does not comply with the Voting Rights Act and is also not compact. As a related matter, the Individual Plaintiffs argue that the current six-district plan is too recent to be used as a benchmark for ideal districts. For this reason, they quibble with the Special Master's statement that there are no political subdivisions in Chicago Heights.

The Court considers these second and third objections moot given its decision that the Individual Plaintiffs' plan and map will be used for the Chicago Heights City Council elections.

The City merely disguises several earlier, unsuccessful entreaties to this Court as formal objections to the Special Master's Report. First, the City complains that the report fails to consider a Six-Member Voting District Proposal that the City submitted to the Special Master in

June of 2004. According to the City, the Special Master erred in refusing to consider that proposal. The Special Master did so because he provided notice to the parties in April of 2004 that no additional maps would be entertained as his report would be written soon. Reasonable deadlines were certainly appropriate in this hoary case and this Court finds no fault in the Special Master's enforcement of the deadline here. Moreover, the City already submitted this complaint to the Court in the form of an Emergency Motion by Defendant to Remand the Special Master's Report for Further Consideration by the Special Master, filed on December 6, 2004. This motion was denied.

Second, the City objects to the Special Master's Report because it fails to use voting age population to determine whether the proposed plans satisfy the "one person, one vote" requirement. The City has already unsuccessfully argued this point in an earlier brief submitted to this Court. As discussed above, the case law supports the Special Master's use of total population figures.

Finally, the City asserts that the Special Master's report is not supported by the evidence, and the City has been prejudiced in its opportunity to respond to the report because the Special Master has not filed a complete record of the evidence considered in making his recommendations. The Court finds *this objection*, not the Special Master's Report, unsupported. The Special Master considered the three plans presented at a public hearing, several tables and charts are appended to his report, and he has maintained contact with the parties throughout his appointment. The City has not been prejudiced in its ability to review the report. Moreover, the City has offered nothing to support its self-serving conclusion that the report is inconsistent with the evidence.

-18-

## D.    The Court's Findings

Because the Class Plaintiffs' plan contains districts that are more equal in population than the Individual Plaintiffs' plan, the Special Master has recommended the Class Plaintiffs' plan to this Court. He found both the Individual Plaintiffs' plan and the Class Plaintiffs' plan, however, acceptable: "[B]oth . . . satisfy the 'one person, one vote' rule, contain districts that are contiguous and compact, satisfy the Voting Rights Act, and contain no 'racial gerrymanders' requiring strict scrutiny under Shaw." Special Master's Report at 18. The City's plan, by contrast, fails to satisfy the "one person, one vote" principle.

There being no material, supported objections to the Special Master's Report, the Court will credit its findings. Since the Special Master found that the Individual Plaintiffs' plan complies with each of the Court's guidelines, and this Court has granted the stipulation by two of the three parties to adopt the Individual Plaintiffs' plan, the Court will adopt that plan.

## IV. CONCLUSION

For the foregoing reasons, the Perkins and McCoy plan and map will be adopted for the City

of Chicago Heights City Council elections.

Enter:

/s/ David H. Coar
David H. Coar
United States District Judge

Dated: **February 8, 2006**



Perkins and McCoy Map

MAPS
COMPARISON
1=BH
2=HH
3=ES
4=CC
5=WE
6=NE
7=RO



PERKINS & McCOY MAP

1 — Beacon Hill
2 — HH
3 — ES
4 — CC
5 — WE
6 — NE
7 — RO